# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ARMANDO OSEGUEDA,** *et al.***,** | 1:16-cv-1218-LJO-BAM |
| **Plaintiffs,** | |
| **v.** | **MEMORANDUM DECISION AND ORDER RE DEFENDANTS' SECOND MOTION TO DISMISS** |
| **STANISLAUS COUNTY PUBLIC SAFETY CENTER.,** *et al.***,** | |
| **Defendants.** | **(ECF No. 23)** |

  This is a putative class action suit commenced by Plaintiffs Armando Osegueda and Robert Palomino ("Plaintiffs") alleging four causes of action under 42 U.S.C. § 1983 against Defendants Stanislaus County Public Safety Center ("PSC"); Stanislaus County Sheriff's Office ("Sheriff's Office"); Adam Christianson, the Stanislaus County Sheriff; Bill Duncan, PSC Facilities Captain; Greg Clifton, Lieutenant of Units 1 and 2; Ronald Lloyd, Commander of Bureau Administrative Services; Steven Verver, a sergeant at PSC; and James Shelton, a classification officer at PSC (collectively, "Defendants"). Second Amended Complaint ("SAC") (ECF No. 22). Plaintiffs filed the SAC after the Court issued a memorandum decision and order granting in part and denying in part Defendants' motion to dismiss the First Amended Complaint. *See* ECF No. 21.

1

Now before the Court is Defendants' second motion to dismiss pursuant to Federal Rule[1] of Civil Procedure 12(b)(6). ECF No. 23. Plaintiffs filed their opposition (ECF No. 25) and Defendants have replied (ECF No. 26). This matter is suitable for disposition on the papers. *See* E.D. Cal. L.R. 230(g). For the reasons the follow, the Court GRANTS IN PART AND DENIES IN PART Defendants' motion to dismiss.

## FACTUAL ALLEGATIONS[2]

### A. Classification at Stanislaus County Detention Facilities

Upon booking in Stanislaus County detention facilities, detainees are asked whether they are "active" or "a drop-out," or if they can be housed "with anybody or whether they need protection." SAC ¶¶ 78-79.[3] They are not provided the option to say that they are neither. *Id.* ¶ 79. If a detainee is classified as an active Norteño (gang member) he is issued a green and white jumpsuit, which, according to Sheriff's Office policy, denotes "Administrative Segregation and Norteño," and is housed in an "active tank[4]," along with other suspected gang members *Id.* ¶ 80. According to this policy, detainees subject to "Administrative Segregation" are defined as

> Inmates who are determined to be prone to escape, assault staff, assault other inmates, violate facility rules or criminal laws, and/or disrupt the operations of the facility. Administrative segregation shall consist of separate and secure housing, but shall not involve any other deprivations of privileges other than is necessary to obtain the objective of protecting other inmates and staff or as a consequence of the inmates behavior.

*Id.* ¶¶ 51, 81. Furthermore, the Sheriff's Office maintains a list of "hazard codes," assigning codes to Norteño, Sureño, and Northern Hispanic groups (which are typically associated with persons of

---

[1] All further references to any "Rule" are to the Federal Rules of Civil Procedure, unless otherwise indicated.

[2] These allegations are drawn from the SAC, the general truth of which the Court must assume for purposes of a Rule 12(b)(6) motion to dismiss. *See Lazy Y. Ranch LTD. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

[3] The SAC does not provide a specific explanation of what it means if an inmate can be housed "with anybody or whether they need protection." The Court infers this line of questioning to be the Sheriff's Office's means of determining whether or not incoming detainees are gang members.

[4] The Court infers from the SAC that a "tank" is the word used to describe a housing unit in the Men's Jail.

Hispanic descent)," but does not assign codes to groups associated with other races, such as the Aryan Brotherhood, Skinheads, Juggalos, Crips, Bloods, and Pirus. *Id.* ¶ 57, 82. The Sheriff's Office also does not disclose its classification records to defendants or their attorneys, but makes these records available to the prosecution. *Id.* ¶¶ 56, 83. As a result, detainees cannot "intelligently answer or oppose [their] classification." *Id.*

**B. Conditions in Norteño and Northern Hispanic "Tanks" at the Stanislaus County Men's Jail**

Detainees who are classified as active Norteños are housed in "active tanks" upon booking. *Id.* ¶ 80. The active tanks house both pretrial detainees and individuals serving sentences for misdemeanors and/or serving "local prison" time pursuant to AB 109[5], and pre-trial detainees and convicted inmates are often housed in the same tank. *Id.* ¶ 90-91. Each active tank is twenty-five feet by twenty feet, contains six bunk beds, and houses twelve men. *Id.* ¶¶ 84-85. The tanks are also equipped with two toilets and sinks and two large picnic-style tables and a telephone. *Id.* ¶ 85, 87. Some tanks are "unsanitary and in disrepair" and contain black mold; upper respiratory infections and other illnesses are common among inmates housed in the active tanks. *Id.* ¶ 89.

Inmates housed in active tanks are "offered yard privileges outside constrained in a series of cages, without recreational equipment, for three hours a week." *Id.* ¶ 91. The three hours are split into two ninety-minute increments. *Id.* If a detainee is away when his yard time his called, he is not given an alternate time and must wait until the next week for his yard privilege. *Id.*

While they are housed in the active tanks, detainees are restrained by waist chains, shackles, and lockboxes that secure their hands tightly to their waist during attorney visits, personal visits, and trips to the courthouse. *Id.* ¶ 92. The lockboxes at the Men's Jail cause detainees to experience pain and discomfort and make the use of telephones painful and impracticable. *Id.* ¶ 92-93.

//

---

[5] California Assembly Bill 109, which went into effect in October 2011, "shifted responsibility for incarceration and parole supervision of prisoners convicted of certain types of crimes from the state prison system to the counties." *Labonte v. Governor of California*, No. EDCV 13-1204-VAP (MAN), 2014 WL 1512229, at *2 (C.D. Cal. Apr. 14, 2014).

## C. Conditions in the "B-Max"

The B-Max is the maximum security unit at PSC. *Id.* ¶ 29. Assignment to the B-Max is often based on the charges that the pretrial detainee is facing allegations that have been charged (but not proven) that the person is a Norteño or Northern Hispanic gang member. *Id.* ¶ 54. At the time the SAC was filed, there were fifteen pretrial detainees housed in the B-Max who were classified as active Norteño or Northern Hispanic gang members. *Id.* ¶ 49. These detainees have been housed in administrative segregation for periods ranging from between five months and seven years, and half of these detainees have been housed in administrative segregation without meaningful review for more than three years. *Id.* There are also pretrial detainees who have been housed in the B-Max for more than ten years waiting for their trials. *Id.* Administrative segregation is "over-used" in the Stanislaus County jail system and the majority of pretrial detainees who are housed in administrative segregation are housed there for "non-disciplinary reasons." *Id.* ¶ 51. Pretrial detainees who are assigned to the B-Max are often kept in the B-Max for disciplinary reasons and are often held there for indeterminate lengths after their disciplinary periods are served. *Id.* ¶ 58.

A detainee housed in the B-Max shares a "cramped concrete cell" that measures six-and-a-half feet by twelve feet with one other cellmate. *Id.* ¶ 59. The cell has a bunk bed, a combination toilet-sink unit, a desk, a stool, and a fluorescent light in the ceiling. *Id.* Detainees in the B-Max stay in their cells for thirty-eight to eighty continuous hours at a time and are only permitted three showers per week and three hours of "yard/recreation" time per week. *Id.* ¶¶ 59, 64. First-floor detainees are scheduled for yard time on Mondays, Thursdays, and Saturdays for one hour at a time. *Id.* Second-floor detainees are scheduled for yard time on Tuesdays, Fridays, and Sundays. *Id.* Morning and evening yard times are alternated. *Id.*

The "recreational yard" is an enclosed concrete cell with a window approximately twenty feet high equipped with a telephone and a television. *Id.* ¶ 63-64. There is no access to the outdoors, no exercise equipment, no recreational equipment, and no seating. *Id.* ¶ 64. Because the window is covered

with a screen or wired mesh, the window does not allow for unobstructed sunlight and fresh air, and does not afford detainees an outdoor environment. *Id.* B-Max detainees are only exposed to the outdoors during their walks to and from transportation taking them to the courthouse. *Id.* ¶ 65. Furthermore, the yard schedule and telephone restrictions limit B-Max detainees to only four telephone calls during normal business hours per month. *Id.* ¶ 67.

Like detainees housed in active tanks, B-Max detainees are also restrained by waist chains, shackles, and lockboxes that secure their hands to their waist during attorney visits, personal visits, and court. *Id.* ¶ 71. The lockboxes cause them to experience pain and discomfort and make it painful and impracticable for detainees to use the telephones to speak to their visitors. *Id.* ¶¶ 72-73.

B-Max detainees are unable to challenge or request meaningful review of the conditions in the B-Max, including the amount of time in which they are confined to their cells. *Id.* ¶ 68, 70. Defendant Clifton has informed them that housing is not a "grievable" matter and that housing in the B-Max "is not a restrictive program." *Id.* ¶¶ 68, 70. Defendant Verver has informed them that "current policy and procedure are being administered correctly in regards to the classification and housing of inmates in Stanislaus County. You were and are housed with respect to your charges." *Id.* ¶ 69. Defendants, "by and through their policies and practices, personally and through their agents," have suggested that if detainees are unhappy with their housing, they could always debrief.[6] *Id.* ¶ 75. Furthermore, detainees are denied the ability to make "citizen's complaints" regarding officer misconduct or the "disproportionately harsh treatment they are afforded," and are then informed that they are "not a citizen, you are an inmate." *Id.* ¶ 77.

---

[6] The SAC does not provide a specific explanation for what it means for a detainee to "debrief." However, the California Court of Appeal, citing section 3378.1(a) of Title 15 of the California Code of Regulations, has defined "debriefing" as

"the process by which a gang coordinator/investigator determines whether an inmate/parolee (subject) has dropped out of a gang. A subject shall be debriefed only upon his or her request, although staff may ask a subject if he or she wants to debrief. Debriefing shall entail a two-step process that includes an interview phase and an observation phase."

*In re Sampson*, 197 Cal. App. 4th 1234, 1239 n.5 (June 30, 2011).

**D. Plaintiffs and Their Putative Classes**

Plaintiff Armando Osegueda is a thirty-five-year-old pretrial detainee. *Id.* ¶ 47. He was placed in the care and custody of the Sheriff's Office on March 12, 2012. *Id.* ¶ 30. Osegueda was housed in the B-Max from October 17, 2012 until August 2016. *Id.* ¶ 31. Despite a Sheriff's Office policy stating that all detainees are granted a classification review every three months, Osegueda did not receive a classification review for nearly four years while he was housed in the B-Max. *Id.* ¶ 32-33. In May 2016, Osegueda was granted a "downgrade packet," but was never afforded the opportunity to challenge his classification or present his views regarding classification. *Id.* He was granted a green and white jumpsuit (which denotes administrative segregation) rather than the red and white jumpsuit (which denotes maximum security) that he had been wearing since his incarceration. *Id.* ¶ 34. In August 2016, Osegueda was moved into an active Norteño tank, but was returned to the B-Max, without warning or hearing, on January 20, 2017. *Id.* ¶ 35-36. As of January 30, 2017, Osegueda had not yet received a hearing or classification review regarding his return to the B-Max. *Id.* ¶ 37.

Plaintiff Robert Palomino is a forty-seven-year-old pretrial detainee. *Id.* ¶ 39, 47. He was placed into the care and custody of the Sheriff's Office on February 26, 2013, and was housed in the B-Max from February 26, 2013 until May 2016. *Id.* ¶ 38. Palomino did not receive a classification review while he was in the B-Max and repeatedly requested to be downgraded. *Id.* ¶¶ 40-41. In or about May 2016, Palomino was pulled from his cell and escorted into a room with Defendants Shelton and Verver, and non-party Sergeant Martinez. *Id.* ¶ 42. Palomino had previously submitted a grievance, which Verver submitted to Defendant Lloyd. *Id.* Lloyd then decided to remove Palomino from the B-Max. *Id.* Palomino was subsequently granted a green and white jumpsuit, and was moved into an active Norteño tank. *Id.* ¶¶ 43-44. However, on January 20, 2017, Palomino was returned to the B-Max without warning or hearing, and as of January 30, 2017, Palomino has not received a classification review or hearing. *Id.* ¶¶ 45-46.

Plaintiff David Lomeli has been in the care and custody of the Sheriff's Office since April 22,

2013. *Id.* ¶ 17. He denies any gang membership, has never received a classification review, and at all relevant times, has been housed in an active tank. *Id.*

Plaintiff Jairo Hernandez was in the care and custody of the Sheriff's Office from December 15, 2015 through January 24, 2017, when the charges against him were dismissed. *Id.* ¶ 21. Hernandez was housed in an active tank. *Id.*

**E. Excessive Force Allegations**

Plaintiffs and those similarly situated are subjected to "excessive force" during "raids" and routine searches of their cells. *Id.* ¶ 96. When correctional officers and members decide to search inside an active tank, they use "flash bang" grenades on the tier before approaching the cells and shooting into the cell with shotguns or block guns while ordering detainees to get down. *Id.* ¶ 98-99. Because the doors are closed and locked, the correctional officers are not in any danger as they conduct these searches. *Id.*

In or about October 2012, when Osegueda was in an active tank, officers came inside his cell and shot pepper balls into it, spraying powder everywhere, despite there being no threat to the officers. *Id.* ¶ 100. The officers shouted obscenities at the detainees, handcuffed them, and took them to another room, where the detainees were strip searched and the cell was searched. *Id.*

In or about July 2013, pretrial detainees in the B-Max, including Osegueda and Palomino, were removed from their cells and placed in a concrete "yard" in only their boxers and were forced to remain on their knees with block guns pointed at them for hours. *Id.* ¶ 105. They were not permitted to move, shift, access restrooms or drink water while the cells in the B-Max were being searched. *Id.*

In or about June 2014, Osegueda and Palomino returned from court and entered the B-Max. *Id.* ¶ 102. Detainees were in the yard, on their knees, with guns pointed at them. *Id.* Osegueda and Palomino were stripped and placed in the yard on their knees, with guns pointed at them, for another one to two hours. *Id.*

In or about November 2014, members of the Correctional Emergency Response Team ("CERT")

entered the B-Max after dinner and told detainees to "cuff up" through the tray slot and threatened to shoot detainees if they shifted. *Id.* ¶ 103. The officers pointed guns and tasers at the detainees, who were moved to the multipurpose room or showers to be strip searched before being brought to the dayroom, where they remained for another two to three hours. *Id.*

In or about December 2015, Lomeli and Hernandez were housed in the active tank. *Id.* ¶ 104. At about 6:00 or 7:00 pm, Lomeli was in the dayroom watching television. *Id.* CERT members began to conduct a search and shot "pepper balls" and deployed a "flash-bang grenade" near the cell shared by Lomeli and Hernandez. *Id.* Hernandez was hit with shrapnel. *Id.* Lomeli backed up to get out of the way, but was struck by rounds in the neck and leg when he tried to duck behind the table. *Id.* There was no ongoing incident and no known threat to the officers, and no contraband was located. *Id.*

On or about January 29, 2017, at approximately 6:00 am, while Lomeli was sleeping in his cell in the active tanks, CERT members approached his cell and started shooting from outside the bars. *Id.* ¶ 106. Detainees were placed in mechanical restraints as officers searched the cell. *Id.*

## **PROCEDURAL BACKGROUND**

On January 17, 2017, the Court granted in part and denied in part Defendants' motion to dismiss the FAC. ECF No. 21. Specifically, the Court found that the FAC had stated cognizable constitutional violations with regard to Fourteenth Amendment conditions of confinement and due process, dismissed the remaining claims and some of the originally named Defendants, and granted Plaintiffs leave to amend most of their claims. *Id.* at 22-23.

In the SAC, Plaintiffs now bring four constitutional claims based on the allegations described above: conditions of confinement, due process, equal protection, and excessive force. ECF No. 22. The SAC also re-asserts *Monell* liability against the Sheriff's Office and PSC. *Id.* Plaintiffs seek monetary damages, punitive damages, declaratory relief, and injunctive relief. *Id.* at 27-28.

//

//

## STANDARD OF DECISION

A motion to dismiss pursuant to Rule 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. Dismissal under Rule 12(b)(6) is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (quoting *Twombly*, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. "[T]o be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. To the extent that the pleadings can be cured by the allegation of additional facts, a plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern Cal. Collection Serv., Inc.*,

911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

In ruling on a Rule 12(b)(6) motion, "[a] court may take judicial notice of [undisputed] matters of public record' without converting a motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Moreover, the court is permitted to consider matters that are proper subjects of judicial notice under Federal Rule of Evidence 201: facts that are not subject to reasonable dispute because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See Lee*, 250 F.3d at 668.

## DISCUSSION

### I. Request for Judicial Notice

Defendants have asked that this Court take judicial notice of section 1065 of Title 15 of the California Code of Regulations, which pertains to the exercise and recreation programs in correctional facilities. ECF No. 23-2. Plaintiffs do not oppose this request. Because California regulations are undisputed matters of public record, the Court GRANTS Defendants' request.

### II. The Addition of Lomeli and Hernandez as Plaintiffs

Defendants argue that the SAC's addition of David Lomeli and Jairo Hernandez as plaintiffs in this case is not permissible because the Court's prior order, ECF No. 21, did not grant leave to amend to add additional parties and new claims. ECF No. 23-1 at 16-17. Furthermore, Defendants argue that Lomeli and Hernandez's claims must be dismissed because, *inter alia*, Lomeli and Hernandez's claims do not arise out of the same transaction, occurrence, or series of transactions or occurrences that Osegueda and Palomino placed at issue, and because their claims do not involve common issues of law and fact within the meaning of Rule 20. *Id.* at 17.

According to Plaintiffs' opposition, they assert that the joinder of Lomeli and Hernandez was proper because they had previously specifically requested leave to amend in relation to their excessive force claim, and "[i]t is Plaintiffs' belief that it was inherent in this Court's July 17, 2017 [sic] Order grating [sic] leave to amend their excessive force claim, that the Court was also granting Plaintiffs' request to add David Lomeli and Jairo Hernandez as additional named Plaintiffs." ECF No. 25 at 28-29.

Under Rule 20(a)(1), persons may join in an action as plaintiffs if "they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all plaintiffs will arise in the action." Furthermore, "[e]ven [if] these requirements are met, a district court must examine whether permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to either side." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (citing *Desert Empire Bank v. Insurance Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)).

In its January 17, 2017 Order, the Court dismissed Plaintiffs' Eighth Amendment excessive force claim with leave to amend, because the allegations in the First Amended Complaint ("FAC") were too vague for the Court to evaluate the claim. ECF No. 21 at 18. The SAC has attempted to cure the deficiencies the Court identified in the FAC through additional excessive force allegations brought on behalf of Lomeli and Hernandez, in addition to allegations relating to Osegueda and Palomino. Because the Court granted Plaintiffs leave to amend their excessive force claim, and upon the Court's review of the SAC, Lomeli and Hernandez, like Osegueda, have brought excessive force allegations related to their housing in an active tank, the Court finds that the joinder of Lomeli and Hernandez is proper under Rule 20 because their claims are related. Accordingly, the Court will consider their allegations in evaluating Plaintiffs' excessive force claim.

### III. Constitutional Violations

As in its previous Order, the Court will first address whether Plaintiffs have alleged facts that could plausibly support constitutional claims before addressing liability as to the Defendants.

**A. First Cause of Action: Fourteenth Amendment -- Conditions of Confinement**

The SAC repeats the allegations[7] contained in the FAC pertaining to Plaintiffs 1) being housed in the B-Max on account of being classified as Norteño or Northern Hispanic gang members; 2) being housed in the B-Max as a means to coerce them into providing information or accepting pleas; 3) having limited access to telephones; 4) being subjected to sensory deprivation; and 5) being denied adequate opportunities for outdoor exercise. Furthermore, in their motion to dismiss Plaintiffs' conditions of confinement claim, Defendants raise for the first time an argument that the length of Plaintiffs' pretrial detention does not state a claim. ECF No. 23-1 at 22-3.

**i. Claims Previously Dismissed With Leave to Amend**

The Court's January 17, 2017 Order dismissed with leave to amend the first, second, and third of the allegations listed above. *Id.* at 7 n.5, 10, 11. Although Plaintiffs were granted leave to amend these allegations, the SAC does not add any more substantive factual allegations that render these allegations cognizable. Indeed, for the most part, the allegations in the SAC repeat verbatim what is contained in the FAC with regards to Plaintiffs' Fourteenth Amendment conditions of confinement claim. *Compare* FAC ¶¶ 76-86 *with* SAC ¶¶ 107-127.[8]

Regarding Plaintiffs' reiterated housing and classification claims, Defendants note that the SAC fails to allege any additional facts that could remedy the deficiencies identified by the Court in its previous Order, such as Palomino's or Osegueda's criminal charges being changed or dismissed such that it could affect their classification. ECF No. 21-1 at 20. The section in Plaintiffs' opposition brief purporting to address housing and classification as it relates to their Fourteenth Amendment conditions

---

[7] The SAC also repeats allegations pertaining to Plaintiffs being denied access to vocational, educational, and rehabilitative programs. SAC ¶ 112. The Court's January 17, 2017 Order dismissed this allegation without leave to amend. ECF No. 21 at 10-11. The Court now reiterates its previous determination that this allegation is incurably deficient, for the reasons set forth in its January 17, 2017 Order. *See id.* To be clear, Plaintiffs' allegations regarding access to vocational, education, and rehabilitative programs are DISMISSED WITHOUT LEAVE TO AMEND.

[8] The main difference between the FAC's allegations and the SAC's allegations of Plaintiff's conditions of confinement claim is in the numbering of the paragraphs.

of confinement claim contains citations to cases mostly relating to due process claims rather than conditions of confinement, *see* ECF No. 25 at 22-23, and fails to rebut Defendants' arguments. The Court therefore sees no reason to depart from its prior determination that the decision to house Plaintiffs separately from other pre-trial detainees was warranted and served a legitimate, governmental objective of maintaining security and order in the PSC, for purposes of a Fourteenth Amendment conditions of confinement claim.

Regarding the allegations that detainees in the B-Max are denied access to their telephones, the Court notes that it cited the Ninth Circuit's holding that "[a]lthough prisoners have a First Amendment right to telephone access, this right is subject to reasonable limitations arising from the legitimate penological administrative interests of the prison system" in dismissing this allegation for failure to state a claim. *Id.* at 11 (citing *Johnson v. State of Cal.*, 207 F.3d 650, 656 (9th Cir. 2000)). Like the FAC, the SAC alleges that B-Max detainees are allowed three hours per week of "yard time," during which they have access to a telephone. SAC ¶ 64. It further alleges that telephones are "readily available" to all groups aside from B-Max detainees, including men housed in the active tanks. *Id.* ¶ 110. This additional allegation does not alter the Court's previous determination that B-Max detainees' access to telephones is not in violation of the Fourteenth Amendment.

Similarly, the SAC's additional allegations regarding Defendants' alleged use of the B-Max to coerce detainees into becoming informants or accepting plea deals[9] are materially identical to those in the FAC. *Compare* SAC ¶¶ 115-118 with FAC ¶¶ 82-84.[10] The Court's January 17, 2017 Order found that these allegations did not fit within the parameters of a Fourteenth Amendment conditions of

---

[9] In both the FAC and the SAC, Plaintiffs state that a court has found it "tantamount to indefinite administrative segregation for silence – an intolerable practice in modern society." FAC ¶ 82; SAC ¶ 116. The FAC listed "Griffin, No. C-98-21038 at 11" as the source for this quotation, and the SAC does not provide a citation. *See id.* Plaintiffs' counsel is advised to provide proper citations in the future.

[10] In relation to this claim, the only difference between the FAC and the SAC is that the content of the FAC in paragraph 82 is broken up into two paragraphs (115 and 116) in the SAC, and the SAC does not include a citation for a quotation that the FAC includes.

confinement claim and therefore dismissed them with leave to amend. ECF No. 21 at 7 n.5.

Furthermore, as noted by Defendants in their motion, the SAC's allegations are "non-descript" and "impermissibly conclusory to be accepted as true, and violate Rule 8 pleading standards," given that there are no allegations in the SAC that "any named Defendant ever approached either [Osegueda or Palomino] and requested they take a plea deal or debrief in exchange for a housing assignment change." *See* ECF No. 23-1 at 21. Defendants additionally observe that moving an inmate who has dropped out from a gang into alternate housing for that inmate's safety is in accordance with the Ninth Circuit's holding in *Madriz v. Gomez*, which states that "administrative segregation may properly be used to protect the prisoner's safety," and would be within the authority of California's prison administrators to implement a classification and housing plan to ensure the safety of all inmates. *See* 889 F. Supp. 1146, 1272 (N.D. Cal. 1995); *see also* 15 C.C.R. § 1050(a) (authorizing California prison administrators to "develop and implement a written classification plan designed to properly assign inmates to housing units and activities according to the categories of sex, age, criminal sophistication, seriousness of crime charged, physical or mental health needs, assaultive/non-assaultive behavior and other criteria which will provide for the safety of the inmates and staff."). Plaintiffs' nonsensical argument in their opposition brief that "Defendants [sic] alleged statements that if Plaintiffs debrief they will be moved to less restrictive conditions belays [sic] any argument that Plaintiffs [sic] placement is related to any appropriate penological reasons," ECF No. 25 at 23, fails to convince the Court otherwise.

Despite being granted leave to amend these allegations, Plaintiffs failed to do so meaningfully. Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment conditions of confinement claims insofar as it relates to their classification as Norteños causing them to be placed in the B-Max, telephone access, and Defendants' purported coercion of Plaintiffs through housing in the B-Max. Dismissal shall be with prejudice.

### ii.  Outdoor Exercise and Sensory Deprivation

The Court's January 17, 2017 Order found that Plaintiffs had stated cognizable Fourteenth

14

Amendment conditions of confinement claims in relation to their allegations that Defendants had subjected them to sensory deprivation and did not provide them with adequate opportunities for outdoor exercise. ECF No. 21 at 11-12. Defendants now move to dismiss Plaintiffs' exercise claim on the grounds of qualified immunity, arguing that because the SAC alleges that Plaintiffs are afforded three hours of exercise per week, and California prison regulations provide that three hours of exercise per week is lawful, Defendants' actions relating to Plaintiffs' access to exercise were lawful. ECF No. 23-1 at 24-25.

In their opposition brief, Plaintiffs contend that their exercise allegations survive Defendants' motion to dismiss, noting that the SAC does not actually state that Plaintiffs are afforded three hours of exercise, but rather, that they are afforded three hours of "yard" time in an enclosed concrete cell that does not allow in unobstructed sunlight or filtered air, and that lacks any exercise or recreational equipment. ECF No. 25 at 20.

Upon review of the pleadings and the relevant case law, the Court agrees with Plaintiffs. "[E]xercise has been determined to be one of the basic human necessities protected by the Eighth Amendment, and a long-term deprivation of <u>outdoor</u> exercise for inmates is unconstitutional." *Hearns v. Terhune*, 413 F.3d 1036, 1042 (9th Cir. 2005) (internal quotation marks and citations omitted) (emphasis added). Furthermore, "[s]ensory deprivation or excessive limitation of activity may constitute an Eighth Amendment violation." *Baumann v. Ariz. Dept. of Corr.*, 654 F. 2d 841, 846 (9th Cir. 1985). Defendants' arguments regarding qualified immunity in both their motion brief (ECF No. 23-1 at 23-25) and reply (ECF No. 26 at 7) fail to address the allegations in the SAC that the "yard" time afforded to Plaintiffs does not actually provide them with the opportunity to exercise outside, and that Plaintiffs' only exposure to the outdoors occurs during their walks to and from transportation taking them to the courthouse. *See* SAC ¶¶ 63-64, 92, 95. The Court's reasoning and determination in it January 17, 2017 Order that Plaintiffs have sufficiently alleged a constitutional harm and that Defendants' conduct was objectively unreasonable in failing to rectify the lack of opportunity for detainees to exercise outdoors

and their sensory deprivation remain valid at this stage of proceedings. The Court therefore DENIES Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment conditions of confinement claims regarding outdoor exercise and sensory deprivation.[11]

## B. Second Cause of Action: Fourteenth Amendment -- Due Process

The Court previously found that Plaintiffs had stated a cognizable Fourteenth Amendment due process claim, given that they had alleged that they were never given a chance to present their views before they were housed in the B-Max or shortly thereafter, and that they did not receive classification reviews until more than three years after their arrival at PSC. ECF No. 21 at 13-14. The SAC makes additional allegations related to this claim—notably that on January 20, 2017, both Palomino and Osegueda were both moved to the B-Max without warning, and as of January 30, 2017, neither had received classification reviews. SAC ¶¶ 35-37; 44-46.

Defendants' motion to dismiss does not appear to seek dismissal of Plaintiffs' Fourteenth Amendment due process claim, as it does not meaningfully address this claim in a specific manner. Therefore, for the reasons stated in the Court's January 17, 2017 Order, the Court finds that Plaintiffs

---

[11] In their motion, Defendants additionally argue that the SAC fails state a cognizable conditions of confinement claim based on the alleged length of Plaintiffs' detention in the B-Max, noting that the SAC alleges that the length of pre-trial detention in the B-Max strips detainees of "basic human dignity," and that "[v]irtually no other county or state uses mere alleged gang association or memberships to confine prisoners in SHU facilities." ECF No. 23-1 at 22-23. Defendants note that that the SAC does not define the term "SHU," despite using it repeatedly. *Id.* Like Defendants, the Court will assume that by "SHU," Plaintiffs mean "secure housing unit" and are using the term "SHU" as a proxy for B-Max confinement.

As the Court understands the SAC, Plaintiffs' allegations regarding the length of their confinement in the B-Max extending over three to four years are not pleaded as a discrete conditions of confinement claim, but rather are allegations that provide factual support and context for their outdoor exercise and sensory deprivation claims. *See, e.g.*, *Hutto v. Finley*, 437 U.S. 678, 686-87 (1978) ("the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards. A filthy, overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months."); *Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2009) (internal citations omitted) ("Although exercise is 'one of the basic human necessities protected by the Eighth Amendment … a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation.").

Plaintiffs have alleged that they were deprived the opportunity to exercise outdoors for three years (Palomino) and four years (Osegueda). Thus, the length of time that Plaintiffs allege they have been deprived of outdoor exercise as a normal condition of their confinement undoubtedly raises a "substantial constitutional question." *See, e.g.*, *Toussaint v. Yockey*, 722 F.2d 1490, 1493 (9th Cir. 1984) (inmate assigned to administrative segregation for over one year who had been denied outdoor exercise during that time raised "substantial constitutional question."); *Spain v. Procunier*, 600 F.2d 189, 199-200 (9th Cir. 1979) (finding an Eighth Amendment violation where inmates in disciplinary segregation were denied outdoor exercise for four and a half years).

have stated a cognizable Fourteenth Amendment due process claim through their allegations that they were not provided the timely classification reviews required by law. *See Lira v. Herrera*, 448 F. App'x 699, 701 (9th Cir. 2011) (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)) ("When a prisoner is to be administratively segregated, due process requires that he receive 'some notice' of the charges and 'an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation.'"); *see also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir.1990) (upholding a district court order requiring a hearing on prison official's decision to segregate inmate).

Furthermore, the Court's previous Order declined to address whether Plaintiffs' claims regarding Defendants' failure to provide them with notice as to how they might be permitted to rejoin the general detainee population and periodic classification reviews. ECF No. 21 at 13 n.8. Upon review of the relevant law, the Court finds that Plaintiffs' allegations that Defendants denied them periodic classification reviews to which they were entitled also constitute a Fourteenth Amendment due process claim. *See Santos v. Grounds*, No. C 08-3100 JSW (PRS), 2009 WL 839032, at *2 (N.D. Cal. Mar. 30, 2009) (citing *Hewitt v. Helms*, 459 U.S. 460, 477 n. 9); *Toussaint*, 801 F.2d 1080, 1101 (9th Cir. 1986); and *Toussaint v. Rowland*, 711 F. Supp. 536, 540 n. 11 (N.D. Cal. 1989)) ("Where a prisoner is confined to administrative segregation for an indeterminate period of time, prison officials must engage in some sort of periodic review of his confinement … which must amount to more than 'meaningless gestures.'").

However, there is no legal support for Plaintiffs' argument that Defendants' failure to provide Plaintiffs with notice regarding how to rejoin the general population violates due process. The due process standard "is met if prison officials hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, inform the prisoner of the charges against him or the reasons segregation is being considered, and allow the prisoner to present his views" and "an evidentiary basis exist[s] for a prison official's decision to place an inmate in segregation for administrative reasons." *Santos*, 2009 WL 839032, at *2. Because there is no mention that Defendants are required to provide

Plaintiffs with the notices described in the SAC, the Court finds that this allegation does not state a due process violation.

Therefore, to be clear, Plaintiffs' allegations that they were denied timely classification reviews upon their initial placement in the B-Max and periodic classification reviews in the time that followed state a cognizable Fourteenth Amendment due process violation, and they may proceed on this claim.

**C. Third Cause of Action: Fourteenth Amendment -- Equal Protection**

The Court previously granted Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment equal protection claim on the ground that Plaintiffs had failed to allege that they suffered discrimination on account of a protected class, as they had alleged that the disparate treatment they experienced was on account of their classification as Norteño and/or Northern Hispanic gang members, and gang membership is not a protected class within the meaning of the Equal Protection Clause. ECF No. 21 at 14-15.

Defendants again seek dismissal of Plaintiffs' equal protection claim on the same grounds cited in the Court's January 17, 2017 Order. ECF No. 23-1 at 18-19. However, the SAC's allegations of this equal protection claim are noticeably different from those in the FAC that were dismissed. Significantly, the SAC alleges that the Sheriff's Office discriminates against inmates of Hispanic descent, who are denied access to rehabilitative programming, while inmates of other races, even those who are alleged to be members of the Aryan Brotherhood, Skinheads, Nazi Lowriders, Juggalos, Crips, and Bloods, are afforded. SAC ¶ 139. The SAC additionally alleges that alleged members of these non-Hispanic gangs are housed with the "general population" and afforded "all privileges including freedom of movement, more time out of their cells, outdoor yard, educational, rehabilitative, and vocational programs." *Id.* ¶ 140. In Plaintiffs' opposition brief, they further explain that the SAC "does not base the alleged constitutional violation on the fact that the Plaintiffs are alleged gang members, but rather, sets forth equal protection claims based on the fact that alleged Hispanic gang members are treated differently [from] non-Hispanic gangs and gang members." ECF No. 25 at 24. "Stated somewhat differently,

Plaintiffs allege in their SAC that the classification policy of the [Sheriff's Office] is nothing more than government-imposed racial classification" that denies Plaintiffs' rehabilitative programming on account of their race. *Id.*

"The fundamental principle that prisoners are protected from race discrimination is longstanding: 'Prisoners are protected under the Equal Protection Claus of the Fourteenth Amendment from invidious discrimination based on race.'" *Harrington v. Scribner*, 785 F.3d 1299, 1305 (9th Cir. 2015) (quoting *Wolff v. McDonell*, 418 U.S. 539, 556 (1974)). Accordingly, the Supreme Court has held that racial classifications in prisons, as in virtually all other contexts, are subject to strict scrutiny, reasoning that "[t]he right not to be discriminated against … is not a right that need necessarily be compromised for the sake of proper prison administration." *Johnson v. California*, 543 U.S. 499, 510 (2005). "[C]ompliance with the Fourteenth Amendment's ban on racial discrimination is not only consistent with proper prison administration, but also bolsters the legitimacy of the entire criminal justice system. Race discrimination is especially pernicious in the administration of justice … [a]nd public respect for our system of justice is undermined when the system discriminates based on race." *Id.* at 510-11 (internal citations omitted). "When government officials are permitted to use race as a proxy for gang membership and violence without demonstrating a compelling government interest and providing that their means are narrowly tailored, society as a whole suffers." *Id.* at 511.

The Equal Protection Clause directs that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 472 U.S. 432, 439 (1985). Thus, to state a cognizable equal protection claim, Plaintiffs "must show that [Defendants] acted with an intent or purpose to discriminate against [them] based upon [their] membership in a protected class." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (citation omitted). "Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status." *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis in original). The first step in an equal protection analysis is to identify "the Defendants' asserted classification of groups," and "[t]he groups must be comprised of

similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Thorton v. City of St. Helens*, 425 F.3d 1158, 1166-67 (9th Cir. 2005).

Here, the Court finds that Plaintiffs have stated a cognizable equal protection claim because the SAC alleges sufficient facts, as described above, to warrant a plausible inference that they were intentionally discriminated against on the basis of their race. The Court is cognizant that gang membership is not a protected class within the meaning of the Equal Protection Clause. *See Mitchell v. Cate*, No. 2:11-cv-1240 JAM AC P, 2015 WL 5255339, at *7 (E.D. Cal. Sept. 9, 2015). Nevertheless, the SAC's allegations that inmates who allegedly belong to gangs not associated with Hispanic ethnicity (*e.g.*, the Aryan Brotherhood, Skinheads, Juggalos, Crips, Bloods) are treated better and differently from those who have been classified as Norteño or Northern Hispanic, without any compelling government interest for this disparate treatment, and that Stanislaus County uses a list of "hazard codes" and only assigns these codes to Hispanic gangs, but does not assign codes to non-Hispanic gangs, are sufficient to survive Defendants' Rule 12(b)(6) motion. The SAC alleges that Hispanic inmates are treated differently from their similarly-situated peers who are members of other gangs associated with non-Hispanic racial groups on account of their race, and that suspicion that an inmate is a Norteño gang member is a proxy for racial discrimination. *Id.* ¶¶ 139-140. Defendants' reply brief does not address this argument. *See* ECF No. 26 at 6. The Court agrees with Plaintiffs that the SAC has sufficiently alleged that Defendants intentionally discriminate against Hispanic detainees, and the allegations that Hispanic inmates are disproportionately housed in the B-Max and are denied access to rehabilitative programming provides factual support for Plaintiffs' equal protection claim. Therefore, the Court DENIES Defendant's motion to dismiss Plaintiffs' equal protection claim.[12]

---

[12] This finding is not inconsistent with the Court's prior determination that the decision to house Plaintiffs in the B-Max on account of the crimes they were charged with served a legitimate purpose and was within the authority of PSC officials. It is beyond dispute that detainees do not have a constitutional right to a particular classification status and that California law authorizes prison and jail administrators to classify and house inmates in a manner that maintains security in the facility. However, because the SAC has alleged that Defendants purposefully discriminate against suspected Norteños and treat them less favorably than non-Hispanic detainees who may belong to other gangs, the SAC states an equal protection claim.

### D. Fourth Cause of Action: Fourteenth Amendment -- Excessive Force

The Court previously granted Defendants' motion to dismiss Plaintiffs' excessive force claim on the ground that the FAC's allegations were too vague and conclusory, and therefore not entitled to the presumption of truth. ECF No. 21 at 17-18.

Defendants argue that the SAC suffers from the same defects as the FAC, notwithstanding the fact that the SAC includes new allegations from Lomeli and Hernandez, and provides specific dates as to when the Plaintiffs allegedly experienced excessive force. ECF No. 23-1 at 26-27. They argue that the SAC, despite these new allegations, nevertheless fails to allege any physical injury to any Plaintiff, and therefore fails to state an excessive force claim. *Id.*

As the parties are well aware, in *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015), the Supreme Court provided a list of non-exhaustive factors to consider when determining whether force was "objectively unreasonable" in violation of the Fourteenth Amendment. These factors include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Under this standard, the Court now turns to the excessive force allegations in the SAC, which lists several different instances during which Plaintiffs allege that they were subjected to excessive force. The Court agrees with Defendants that the two-year statute of limitations bars the Court's consideration of the events that occurred in October 2012, July 2013, and June 2014, given that this case was commenced on August 16, 2016. *See Jones v. Blanas*, 393 F.3d 918, 927 (9th Cir.2004) ("For actions under 42 U.S.C. § 1983, courts apply the forum state's statute of limitations for personal injury actions, along with the forum state's law regarding tolling, including equitable tolling, except to the extent any of these laws is inconsistent with federal law."); Cal. Code Civ. Proc. § 335.1 (California's statute of limitations for personal injury actions is two years). The Court's consideration of Plaintiffs'

excessive force claims is therefore confined to the instances alleged to have occurred on November 2014, December 2015, and January 2017.

The November 2014 allegations fail to state an excessive force claim. *See* SAC ¶ 103. As Defendants point out, the amount of force used does not appear to be objectively unreasonable and the SAC fails to allege any physical injury at all to any Plaintiffs, "given the obvious administrative and security needs of the jail." ECF No. 23-1 at 27.

For similar reasons, the January 2017 allegations also fail to state an excessive force claim. *See* SAC ¶ 106. As with the November 2014 allegations, no Plaintiff is alleged to have suffered any injury. *See id.* Furthermore, given that CERT team officials were conducting a search of the cells, it does not appear to be objectively unreasonable to restrain the detainees during the search.

However, the December 2015 allegations do state an excessive force claim. *See* SAC ¶ 104. Although CERT team officials were conducting a search of the cells, employing a flash-bang grenade and shooting pepper balls into the cells that caused specific injuries to Plaintiffs Hernandez and Lomeli does appear to be objectively unreasonable, in light of the allegations that there was no ongoing incident and no known threat to officers, no effort by the officers to temper their amount of force, and no effort by any of the Plaintiffs to resist.

For these reasons, the Court DENIES Defendants' motion to dismiss Plaintiffs' excessive force claim relating to the December 2015 incident, but GRANTS it in all other respects without leave to amend.

**IV. Liability**

Having determined that the SAC has stated facts that could support cognizable constitutional violations with regard to Plaintiffs' conditions of confinement, due process, equal protection, and excessive force claims, the Court now turns to the issue of liability. 42 U.S.C. § 1983 requires that there be an actual connection or link between the actions of Defendants and the deprivations alleged to have been suffered by Plaintiffs. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978). The Ninth Circuit

has held that "[a] person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). In order to state a claim for relief under § 1983, Plaintiffs must link each named Defendant with some affirmative act or omission that demonstrates a violation of Plaintiffs' federal rights. Plaintiffs must specify which Defendant(s) is allegedly responsible for each violation of his constitutional rights and the factual basis of his Complaint must put each Defendant on notice of Plaintiffs' claims against him. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004).

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). To establish personal liability pursuant to § 1983, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.* Furthermore, when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged. *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979). To state a claim for relief under § 1983 based on a theory of supervisory liability, Plaintiffs must allege some facts that would support a claim that supervisory Defendants either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989) (internal citations omitted). Under § 1983, liability may not be imposed on supervisory personnel for the actions of their employees under a theory of respondeat superior. *Iqbal*, 556 U.S. at 677. "In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer." *Id.* Knowledge and acquiescence of a subordinate's misconduct is insufficient to establish liability; each government official is only liable for his or her own misconduct. *Id.*

Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell*, 436 U.S. at 690 n. 55. Pleading official-capacity liability requires more from a plaintiff than pleading personal-capacity liability. *Kentucky*, 473 U.S. at 166. Because an official-capacity suit against a government employee is essentially an action against the entity, Plaintiffs must plead that the entity itself was a "moving force" behind the constitutional deprivation they suffered, and that the entity's "policy or custom" played a part in the violation of federal law." *Id.*

## A.     Individual Defendants[13]

The SAC lists the following six individual Defendants in connection with its four cognizable claims: 1) Christianson, the elected Stanislaus County Sheriff; 2) Duncan, PSC's Facilities Captain; 3) Clifton, PSC's Facilities Commander; 4) Lloyd, Captain of PSC's Correctional Emergency Response Team and the Commander of the Facility Training Officer Program; 5) Verver, a sergeant at PSC who has personally responded to grievances about conditions in the B-Max; and 6) Shelton, PSC's classification officer that dealt most directly with Plaintiffs. Christianson, Duncan, Clifton, and Lloyd are alleged to be supervisors.

First, the Court finds that Plaintiffs' conditions of confinement claim may proceed against Christianson, Duncan, Clifton, and Verver. Because the SAC alleges that Christianson, Clifton, and Duncan are responsible for conditions in the B-Max, and have been made "personally aware" of

---

[13] Defendants argue that the SAC does not properly allege liability with respect to the individual Defendants, noting that the SAC specifies that each individual Defendant listed above is sued in his official capacity, rather than his personal capacity. ECF No. 23-1 at 13-14. Specifically, Defendants contend that "by moving against all Defendants in their official capacities only, Plaintiffs have only stated a claim against the municipality that employs them, Stanislaus County, and has [sic] not stated a claim against these government officials personally." *Id.* at 14. Plaintiffs responded to this contention as follows in their opposition: "[t]o the extent that the SAC limits the allegations against each of these defendants to only their official capacity, Plaintiffs request that those limits be stricken from the complaint and replaced with allegations that the individual defendants are sued in their individual and official capacities." ECF No. 25 at 9. Given that Plaintiffs' counsel were aware that this was their last opportunity to amend, the Court admonishes them for their carelessness in drafting the SAC. Nevertheless, the Court will evaluate the merits of the SAC's allegations and whether each individual may be held liable in his personal capacity pursuant to § 1983. *See, e.g.*, *Willis v. Blevins*, 966 F. Supp. 2d 646, 658 (E.D. Va. 2013) (upon counsel's apology for the "scrivener's error" and request to construe it as a § 1983 claim, consider a claim labeled in the complaint as a § 1985 claim as a § 1983 claim).

conditions and deprivations in the B-Max through meetings with the Stanislaus County Criminal Defense Bar, it has sufficiently alleged § 1983 supervisory liability as to Plaintiffs' conditions of confinement claim. Admittedly, the supervisory linkage here is weak, but it is nevertheless sufficiently alleged to survive 12(b)(6) dismissal. The allegations relating to Verver are stronger, as the SAC alleges that Verver "personally responded to repeated requests, complaints, and grievances about the unconstitutional conditions at B-Max by claiming, *inter alia*, that 'gang members are not attempting to rehabilitate themselves," and that Verver has been made "personally aware" of the conditions in the B-Max through grievances made by Plaintiffs and other detainees. SAC ¶ 27.

Second, the Court finds that Plaintiffs' due process and equal protection claims may proceed against Christianson, Duncan, Clifton, and Shelton. The reasoning regarding their supervisory liability for the conditions of confinement claim applies here as well. Regarding Shelton, because the SAC alleges that Shelton is the classification officer who "deals most directly with Plaintiffs and others similarly situated," and is the officer who is "in charge of classification assignments, housing assignments, and debriefs," the SAC sufficiently alleges personal liability against him.

Third, the Court finds that Plaintiffs' excessive force claims may proceed against Christianson, Duncan, Clifton, and Lloyd. The reasoning regarding supervisory liability for Christianson, Duncan, and Clifton also apply to the excessive force claim. As for Lloyd, given he was alleged to have "trained officers and condoned and participated in a culture of excessive force that is used against pretrial detainees in locked cells during simple cell searches," the SAC adequately alleges personal liability against him.

## B. Entity Defendants and Official-Capacity Liability[14] for Individual Defendants

The SAC lists two public entities as Defendants: PSC and the Sheriff's Office.

To state a claim against a public entity under *Monell*, a plaintiff must plead "(1) that the plaintiff

---

[14] As discussed above, because an official-capacity against an individual defendant is essentially a proxy for bringing suit against a municipal entity, the analysis for municipal liability pursuant to *Monell* also applies when evaluating whether the individual defendants may be sued in their official capacity. *Kentucky*, 473 U.S. at 166.

possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (2011) (internal quotation marks and citations omitted). The policy must be the result of a decision of a person employed by the entity who has final decision or policy making authority. *Monell*, 436 U.S. at 694. For purposes of a Rule 12(b)(6) motion, allegations of *Monell* liability will be sufficient if they "(1) identify the challenged policy/custom; (2) explain how the policy/custom is deficient; (3) explain how the policy/custom caused the plaintiff harm; and (4) reflect how the policy/custom amounted to deliberate indifference, *i.e.* show how the deficiency involved was obvious and the constitutional injury was likely to occur." *Lucas v. City of Visalia*, No. 1:09-CV-1015 AWI DLB, 2010 WL 1444667, at *4 (E.D. Cal. Apr. 12, 2010). Furthermore, because the SAC asserts a "policymaker" claim based on Christianson's leadership role in the Sheriff's Office and PSC to commit the acts that allegedly caused Plaintiffs' constitutional injuries, the issue before the Court is whether the SAC sufficiently alleges that Christianson was "responsible for establishing final policy with respect to the subject matter in question" and made "a deliberate choice to follow a course of action from among various alternatives." *See Armour v. Country Club Hills*, No. 11 C 5029, 2014 WL 63850, at *7 (N.D. Ill. Jan. 8, 2014) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Defendants again argue that Plaintiffs have failed to state a claim for municipal liability pursuant to *Monell*. ECF No. 23-1 at 15-16. Specifically, they note that there is only one allegation that purports to support *Monell* liability: "Plaintiffs allege that placement and classification are conducted under a written formal and unwritten informal policy that is inherently racially biased." *Id.* at 16 (quoting SAC ¶ 3). Defendants argue that this allegation fails to meet the requirements for *Monell* liability, as noted above. *Id.*

In their Opposition, Plaintiffs argue that because Christianson is the elected Sheriff of Stanislaus County, he is a policymaker within the definition set forth in *Monell*, and therefore, his personal actions

and inactions ascribe liability onto the Sheriff's Office. ECF No. 25 at 14. "His actions and inaction are the actions and inactions of the entity. His actions and inactions create the policy of the entity." *Id.*

Generously construing the SAC's allegations, as it must, the Court finds that the SAC has satisfied the requirements listed above to plead *Monell* liability. The policy identified is that Defendants house and classify detainees in a manner that is racially biased against Hispanic inmates. The policy is deficient because it intentionally discriminates against detainees who are suspected of belonging to Hispanic gangs, but not against detainees suspected of belonging to non-Hispanic gangs. As alleged, the policy has caused harm to the Plaintiffs because it reflects a constitutionally impermissible racial bias against Hispanic inmates; has caused them to be deprived of access to outdoor exercise, sensory stimulation; has caused them to experience excessive force; and is in violation of their due process rights to periodic classification reviews. Furthermore, because the SAC alleges that through meetings with the Stanislaus County Criminal Defense Bar, Defendants—particularly Christianson, the elected Sheriff who oversees the Sheriff's Office—have been made "personally aware" of conditions and deprivations in the B-Max, the SAC adequately alleges deliberate indifference on the part of the Sheriff's Office and PSC. The Court finds that the SAC sufficiently, though tenuously, alleges that Christianson is a policymaker who exercised "at least *de facto* authority with respect to the conduct at issue." *See Armour*, 2014 WL 63850 at *7. Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiffs' *Monell* claims and finds that the individual Defendants may also be sued in their official capacities.

## CONCLUSION AND ORDERS

For the reasons stated above, Defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. As to Plaintiffs' Fourteenth Amendment Conditions of Confinement claim against Defendants Clifton, Duncan, Christianson, and Verver, the Motion is **DENIED** insofar as it alleges that Plaintiffs were not afforded adequate sensory stimulation and opportunities for outdoor exercise, and the Motion is **GRANTED WITHOUT LEAVE TO AMEND** in all

other respects;

2. As to Plaintiffs' Fourteenth Amendment Due Process claim against Defendants Clifton, Duncan, Christianson, and Shelton, the Motion is **DENIED** insofar as it alleges that Plaintiff were not afforded a timely classification hearing upon placement in the B-Max and were not afforded periodic classification hearings after being housed in the B-Max, but is **GRANTED WITHOUT LEAVE TO AMEND** in all other respects;

3. As to Plaintiffs' Fourteenth Amendment Equal Protection claim against Defendants Clifton, Duncan, Christianson, and Shelton, the Motion is **DENIED**;

4. As to Plaintiffs' Fourteenth Amendment Excessive Force claim against Defendants Clifton, Duncan, Christianson, and Lloyd, the Motion is **DENIED** insofar as it relates to the December 2015 incident, but is **GRANTED WITHOUT LEAVE TO AMEND** in all other respects;

5. As to Plaintiffs' *Monell* allegations, the Motion is **DENIED**.

Furthermore, Defendants must **ANSWER** the SAC within twenty-one (21) days of the date of this Order.

IT IS SO ORDERED.

Dated:   **April 11, 2017**                     **/s/ Lawrence J. O'Neill**
                                               UNITED STATES CHIEF DISTRICT JUDGE